# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00936-COA

**ANTHONY K. HOOD AND BARBARA L. HOOD**                    APPELLANTS

**v.**

**CITY OF PEARL, MISSISSIPPI**                                                APPELLEE

DATE OF JUDGMENT:               12/11/2019
TRIAL JUDGE:                    HON. JOHN H. EMFINGER
COURT FROM WHICH APPEALED:      RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:       JAMES D. SHANNON
                                HEATHER LYNN HALL
ATTORNEYS FOR APPELLEE:         WALKER REECE GIBSON
                                REBECCA SUZANNE BLUNDEN
                                LAWRENCE DILLON KING III
NATURE OF THE CASE:             CIVIL - PROPERTY DAMAGE
DISPOSITION:                    REVERSED AND REMANDED - 11/09/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     After significant rainfall, Anthony and Barbara Hood's home in Pearl, Mississippi, would flood. The Hoods sued the City of Pearl for negligence, and the City filed a motion for summary judgment. The Rankin County Circuit Court granted summary judgment, finding that the City was immune from liability under the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2019)—specifically, discretionary-function immunity pursuant to section 11-46-9(1)(d).

¶2.     On appeal, the Hoods assert that (1) the trial court mischaracterized their negligence

claim and erred by granting summary judgment in favor of the City,[1] and (2) the trial court erred in failing to require the City to answer discovery and failing to allow additional discovery before it considered the City's summary judgment motion. We reverse the trial court's grant of summary judgment in the City's favor and remand this case for further proceedings as detailed below.

## FACTS AND PROCEDURAL HISTORY

¶3. On February 2, 2016; March 10, 2016; and January 2, 2017, the Hoods' residence located on Amanda Drive in the Longmeadow Subdivision in Pearl, Mississippi, flooded after significant rainfall. According to the Hoods, the water overflowed from a "drainage ditch . . . adjacent to [their] property[,]" which connected to a culvert under Amanda Drive that could not handle large amounts of rainfall. The Hoods also believed that at least some of the water flowed from a retention pond in the Woodson Bend Subdivision that also could not handle the rainfall.

¶4. On August 2, 2017, the Hoods filed a complaint against the City and Lost Pine Development LLC for negligence, private nuisance, continual trespass, and vicarious liability.[2] Among other allegations, the Hoods alleged that the defendants were responsible for . . . inspecting [and] maintaining . . . the Woodson Bend Part One common area storm

---

[1] The Hoods also assert that the trial court erred in failing to grant summary judgment in their favor based upon the arguments they raised in their motion for reconsideration relating to the Mississippi Supreme Court's decision in *Moses v. Rankin County*, 285 So. 3d 620 (Miss. 2019). We discuss the *Moses* case in addressing the Hoods' first assignment of error and thus do not list it as a separate issue on appeal.

[2] Lost Pine Development LLC was eventually dismissed with prejudice from the lawsuit.

2

water detention pond and the drainage ditches and system that serves Woodson Bend and Longmeadow Subdivision, which were inadequate to control runoff and are prone to overflow." The Hoods further alleged that "[d]ue to improper construction, development, inspection and maintenance, the storm system was prone to clog with debris which prevents the rainwater from draining properly and leads to flooding."

¶5.     With respect to their negligence claim, the Hoods asserted that the defendants were negligent in:

> a.  Failing to engineer, develop, construct, and/or build a proper and suitable drainage system to serve the properties . . . including the Plaintiffs' property . . . ;
>
> b.  Failing to engineer, develop, construct, and/or build a[n] adequate, proper and suitable [r]etention pond to serve the properties at Woodson Bend Subdivision, which would not cause unnecessary back up and flooding . . . in Longmeadow Subdivision, including the Plaintiffs' property . . . ;
>
> c.  Allowing an inadequate drainage system, ditches and culverts including but not limited to the drainage ditch adjacent, ditches and culverts to and/or which services the Plaintiffs' property . . . ;
>
> d.  Allowing an inadequate [r]etention pond to serve the properties situated at Woodson Bend Subdivision, which caused unnecessary back up and flooding . . . in Longmeadow Subdivision, including the Plaintiffs' property . . . ;
>
> e.  Failing to inspect and/or maintain the drainage system, ditches and culverts including but not limited to the drainage ditch adjacent, ditches and culverts to and/or which services the Plaintiffs' property . . . ;
>
> f.  Failing to inspect and/or maintain the [r]etention pond used to serve the properties situated at Woodson Bend Subdivision, which caused unnecessary back up and flooding . . . in Longmeadow Subdivision, including the Plaintiffs' property . . . ; [and/or]
>
> g.  Other acts or omissions encompassed within the Defendants' duties to citizens, residents[,] and property owners, including but not limited to the

3

Plaintiffs, to be shown at trial.

¶6.    The Hoods alleged in their complaint that the defendants "knew or should have known that drainage ditches and/or culverts along Amanda Drive as well as the drainage system of Woodson Bend Subdivision and the detention pond [were] inadequate . . . such that they were unable to properly drain and divert large amounts of rainfall which may fall within a short period of time"; that the defendants knew or should have known that the drainage system was in need of maintenance "in order to remove tree roots, stumps, and/or other debris and obstructions . . ."; and that the defendants "failed to take any corrective action to prevent the flooding, . . . failed to properly investigate the matter, failed to make any studies to determine the cause of the problem . . . [or] to do anything that would stop and/or alleviate the flooding that damaged the [Hoods'] property."

¶7.    The City filed an answer and asserted, among other things, that the Hoods' claims were barred by the MTCA.

¶8.    In February 2018, the Hoods filed a notice of service of request for admissions, interrogatories, and production of documents. In March 2019, however, the City filed a motion for summary judgment without responding to the Hoods' discovery requests.[3]

¶9.    In the motion for summary judgment, the City asserted that the retention pond was located on private property and therefore was not the City's responsibility. As to the culvert, the City asserted that it was not within city limits at the time it was installed, and therefore the City could not be liable for any claims of negligence based on its engineering or

_____

[3] At some point, the City responded to the request for admissions but not the request for interrogatories or production of documents.

4

construction. Regarding the Hoods' claim that the City failed to maintain the culvert, the City asserted that it had statutory discretion as to the maintenance of culverts. Alternatively, the City asserted that it took corrective action to maintain the culvert once it was notified of an issue. Attached to the City's motion was an affidavit executed by Griffin Bond, who was employed as the City's Public Works Superintendent from 2012 to 2016. In his affidavit, Bond confirmed that the City cleaned and repaired its culverts when it became aware of an issue. For example, Bond stated that he oversaw the removal of debris from the culvert after the Hoods notified the City of the issue in May 2014. Additionally, after the Hoods notified the City that their house flooded in February 2016, Bond assisted with the removal of debris and the replacement of a damaged section of the culvert. Bond also stated in his affidavit that after the Hoods notified the City that their house flooded again in March 2016, debris was removed, and the entire culvert was replaced.

¶10. In April 2019, the Hoods filed a response in opposition to summary judgment. The Hoods asserted that the trial court should deny summary judgment because a question of fact existed as to the City's failure "to maintain the drainage system [relating to the Hoods' property] as well as the issue of the size and maintenance of the culvert." They further asserted that the City's "failure to maintain the drainage system and inspect the system prior to and after the flood of [the Hoods' property] on February 2, 2016" all constitute negligence on the City's part. The Hoods asserted that the City had notice of flooding on their property even before February 2, 2016, as evidenced by the complaint filed by the previous property owner alleging that the property flooded on September 5, 2011, as a result of the City "failing

5

to inspect and/or maintain the drainage system," as stated in that complaint, which was attached as an exhibit to the Hoods' response. Excerpts of Anthony Hood's deposition were also attached to the Hoods' response, which showed that Anthony had a conversation with the mayor of Pearl about the flooding problem in February 2016 after the first flooding incident the Hoods experienced. The mayor indicated that water flow studies needed to be completed in an attempt to fix the flooding problem, and the mayor also told Anthony Hood about the house flooding before the Hoods bought it.

¶11.    Also attached to the Hoods' response was an inspection report from Craig Evans, the president of Evans Construction Company LLC, who inspected the Hoods' property in February 2016.  Evans concluded that the property had "a severe and inadequate drainage condition" and an undersized culvert.  Evans believed that three factors could have caused the flooding: (1) "development(s) upstream redirecting more drainage to [the] site than usual," (2) "development(s) downstream slowing the rate of drainage from [the] site than usual," or (3) "an undersized culvert."  The Hoods also hired hydraulics expert Robert Millette, whose letter report was also attached to the Hoods' response.  Like Evans, Millette observed that upstream developments were likely redirecting more drainage toward the Hood's property, contributing to flooding.

¶12.    In its reply, the City asserted that all the allegations in the Hoods' complaint "f[e]ll within the discretionary immunity protections of [the MTCA]."

¶13.    In May 2019, the Hoods' attorney filed a "Rule 56(f) Affidavit." *See* M.R.C.P. 56(f). In the affidavit, the Hoods' attorney stated that the City had not responded to discovery and

asked the court to require the City to respond, continue the matter, and allow depositions to be taken. In particular, he explained the following in his affidavit:

> The discovery responses are needed for discovery purposes to demonstrate that City of Pearl was negligent in its maintenance of the culvert and the ditches on Amanda Drive as alleged in the Plaintiffs' Complaint; that Plaintiffs seek to take depositions; and that discovery is ongoing.

> I am asking the Court to continue this matter and require the City of Pearl to provide their responses to discovery that was propounded on them on May 1, 2018; and allow depositions to be taken and discovery to be had that is necessary. Such as the deposition of the mayor who said the City was going to do water flow studies and the depositions of employees who allegedly did maintenance work. Plaintiffs do not have access to these individuals and cannot obtain affidavits.

¶14. In September 2019, a hearing was held on the City's motion for summary judgment. To avoid repetition, we will discuss below those portions of the hearing transcript relating to the issue before us.

¶15. In October 2019—after the hearing but before the trial judge issued his ruling on the motion for summary judgment—the Hoods filed a motion to compel discovery. According to the Hoods, the City had responded to their request for admissions but not their request for production of documents or the interrogatories. Attached to the motion to compel was a letter to the City's attorney dated August 28, 2018, in which the Hoods' counsel requested a response to the interrogatories. Also attached to the motion to compel was a "good-faith letter" dated September 18, 2018, in which the Hoods' counsel requested a response to the interrogatories and request for production of documents.

¶16. In December 2019, the court entered an order granting the City's motion for summary judgment. The court found, in relevant part:

Based upon the [Hoods'] response to the motion, the attached summary judgment proof and their argument at the hearing, the [Hoods'] claim is not based upon simple negligence by the City of Pearl in failing to keep drainage easements free of debris. Instead the basis of [the Hoods'] claim is that the City was negligent in its approval of other development plans "up stream," its failure to monitor how those approved development plans impacted the flow of water "downstream," and its failure to detect and/or correct any problems caused by any increased water flow as a result of the approved new developments. The [Hoods] contend that their property was flooded and damaged as a result of the increased flow of water from these new developments that the existing drainage system could not properly handle.

In concluding that the Hoods failed to show "that there [was] a genuine issue of material fact as to whether this case turns on acts of simple negligence as described in *Wilcher* [*v. Lincoln County Board of Supervisors*, 243 So. 3d 177 (Miss. 2018)]," the trial court held that "discretionary function immunity [was, therefore,] applicable to the facts of this case." The trial court explained its conclusion as follows:

The City's decision to approve development plans and grant permits to proceed obviously involve elements of choice. How the City should respond to issues related to changes in water flow involve elements of choice. Approving development plans and responding to any issues that may arise as a result of new development involves social, economic and/or political policy considerations. . . . This Court is faced with a situation where it appears that innocent citizens have been injured. However, the injury appears to have been caused, at least partially,[4] by actions of the City that are covered by discretionary function immunity.

¶17. Subsequently, the Hoods filed a motion for reconsideration, asserting that the trial court mischaracterized their negligence claim and that the Mississippi supreme court's recent decision in *Moses v. Rankin County*, 285 So. 3d 620 (Miss. 2019), required reversal. The trial court denied the motion for reconsideration.

---

[4] With respect to the trial court's use of the phrase "at least partially," the trial court noted that "[a] private developer defendant has been dismissed by an agreed order."

8

¶18.   The Hoods appealed.

**STANDARD OF REVIEW**

¶19.   The grant of summary judgment is reviewed de novo. *Wright v. R.M. Smith Invs. L.P.*, 210 So. 3d 555, 557 (¶6) (Miss. Ct. App. 2016). "Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id*. (quoting *Thrash v. Deutsch, Kerrigan & Stiles LLP*, 183 So. 3d 838, 841 (¶10) (Miss. 2016)). Although "the evidence must be viewed in the light most favorable to the nonmovant," *id*., we are also mindful that "the threshold for summary judgment is high[,]" and "[i]f any triable facts exist, the lower court's grant of a summary judgment will be reversed[.]" *Stuckey v. The Provident Bank*, 912 So. 2d 859, 864 (¶8) (Miss. 2005). A decision granting or denying relief under Rule 56(f) of the Mississippi Rules of Civil Procedure is reviewed for an abuse of discretion. *Davis v. Hindman*, 138 So. 3d 214, 217 (¶9) (Miss. Ct. App. 2014).

**DISCUSSION**

I.   **Grant of Summary Judgment in the City's Favor**

¶20.   The Hoods assert that the trial court erred in granting summary judgment in the City's favor based upon discretionary-function immunity because it mischaracterized the negligence claim they have asserted in this case. We agree. Although we find no error in the trial court's finding that "the [Hoods'] claim is not based upon simple negligence by the City of Pearl in failing to keep drainage easements free of debris," we find that in reaching this conclusion, the trial court overlooked the basic negligence claim that the Hoods *did* assert

in this case. Based upon our review of the record as a whole, we find that the Hoods have asserted a basic negligence claim against the City based upon the City's alleged negligent failure in inspecting and maintaining the culverts and drainage system serving the Hoods' property, including, but not limited to, the drainage ditch and culvert on Amanda Drive adjacent to the Hoods' property. Under the applicable law, the maintenance and inspection of a drainage ditch or culvert does not constitute a discretionary function. *Williams v. City of Batesville*, 313 So. 3d 479, 484-85 (¶¶20-30) (Miss. 2021); *Moses*, 285 So. 3d at 625-26 (¶¶13-16); *Estate of Hudson v. Yazoo City*, 246 So. 3d 872, 873 (¶5) (Miss. 2018); *see Bailey v. City of Pearl*, 282 So. 3d 669, 678 (¶¶21-23) (Miss. Ct. App. 2019). We find that with respect to this basic negligence claim, the City is not entitled to summary judgment based upon discretionary-function immunity pursuant to Mississippi Code Annotated section 11-46-9(1)(d) or "permit approval" immunity under section 11-46-9(1)(h), as we address below.

¶21. The supreme court addressed discretionary-function immunity under section 11-46-9(1)(d) in *Williams*, explaining that in *Wilcher v. Lincoln County Board of Supervisors*, 243 So. 3d 177, 186 (¶23) (Miss. 2018), it returned to using the public-policy function test "after finding the test adopted in *Brantley v. City of Horn Lake*, 152 So. 3d 1106 (Miss. 2014), unworkable." *Williams*, 313 So. 3d at 483 (¶12). The public-policy function test has two parts. *Id.* at 483(¶13). First, the Court must determine "whether the activity in question involved an element of choice or judgment. If so, the Court also must decide whether that choice or judgment involved social, economic, or political-policy considerations. Only when both parts of the test are met does a governmental defendant

10

enjoy discretionary-function immunity." *Id.* (citations and internal quotation marks omitted).

Being particularly relevant in this case, the supreme court also recognized that "before employing the [public-policy function] test, the Court must correctly identify the activity in question—the allegedly tortious act giving rise to the claim." *Id.* at (¶14).

¶22.    In "identify[ing] the activity in question," we find that the record reflects that the Hoods' failure-to-inspect-and-maintain claim is set forth in their complaint,[5] and the claim is discussed in the Hoods' response in opposition to the City's summary judgment motion. At the summary judgment hearing the trial court made several efforts to clarify the Hoods' claims. In the course of this questioning, we recognize that the Hoods' counsel agreed, for example, that some of the Hoods' allegations were that the City was negligent in approving development plans and granting permits upstream from their property— actions that arguably involve a discretionary function. Relevant to our analysis, however, is that during this line of questioning, the Hoods' counsel clarified that the Hoods also claimed they were damaged because "[the City] failed to inspect and maintain the drainage ditch, . . . [a]nd if [the drainage easements and culverts were] inspected, [the City] would have found out the

---

[5] For example, the Hoods alleged that "[d]ue to improper construction, development, *inspection and maintenance*, the storm system was prone to clog with debris which prevents the rainwater from draining properly and leads to flooding." (Emphasis added). The Hoods alleged, among other acts, that the City was liable for "[a]llowing an inadequate drainage system, ditches and culverts including but not limited to the drainage ditch adjacent, ditches and culverts to and/or which services the Plaintiffs' property"; "[f]ailing to *inspect and/or maintain* the drainage system, ditches and culverts including but not limited to the . . . ditches and culverts to and/or which services the Plaintiffs' property" (emphasis added); and that the City "knew or should have known that the drainage ditch and drainage system adjacent to . . . Plaintiffs' property [needed] . . . *maintenance* . . . to keep the drainage ditch in proper working order and to prevent storm water from collecting in the ditch and ponding or backing up onto Plaintiffs' property [including] Plaintiffs' home." (Emphasis added).

11

drainage was coming from these subdivisions and the gravel pit up the road and then [the Hoods] wouldn't have had the tremendous amount of water they have." In argument, the Hoods' counsel likewise related the Hoods' "specific allegations of failing to inspect and maintain the drainage system adjacent to the houses" to the applicable caselaw.

¶23.    In short, the "activity in question" in this context is the City's alleged failure to inspect and maintain the drainage system and culverts affecting the Hoods' property in general and, specifically, on Amanda Drive. The issue is whether the City, after receiving notice of the multiple flooding incidents that happened on the Hoods' property, failed to exercise ordinary care in handling the flooding problems in the Hoods' neighborhood and on their property. We find that this constitutes a simple negligence claim not involving "real, policy-based decisions that would provide the City [with] immunity" in this case. *Id*. at 484 (¶23). *Williams* is instructive and supports our decision.

¶24.    The supreme court in *Williams* determined that the plaintiff's lawsuit against the City of Batesville (Batesville) for damages incurred due to sewage backup in her home raised genuine issues of material fact whether Batesville exercised ordinary care in maintaining its sewer system. *Id.* at 485 (¶¶28-30). Beginning in "the spring of 2015, sewage began backing up into Williams's home [in Batesville, Mississippi]. . . . Williams contacted [Batesville] officials, who made numerous visits to her home during the twelve months that flooding on Williams's property persisted." *Id.* at 481 (¶2). After a year of attempting "numerous cost-conscious [measures] to alleviate the problem, [Batesville] authorized and paid for the installation of a . . . lift-station pump solely to ensure that sewage did not continue affecting

12

Williams's home." *Id.* Williams sued Batesville a year later, asserting "a claim for negligence, specifically negligent or deliberate failure to properly operate, maintain, supervise, and/or design the sewer system." *Id.* at (¶3). Batesville moved for summary judgment, claiming that it was protected by discretionary-function immunity under section 11-46-9(1)(d). *Id.* at (¶4). The trial court agreed. *Id.* at 482 (¶6).

¶25.    In reversing the trial court's decision and remanding to allow Williams to pursue her negligence claim, the supreme court recognized that Williams's complaint was that "the [sewage] backup happened in the first place and that [Batesville] mishandled it." *Id.* at 484 (¶23). As such, the supreme court found that "[t]he question is whether sewer maintenance or failure, which we have identified as a discretionary function, involves real, policy-based decisions that would provide [Batesville] immunity or whether [Batesville] was simply negligent." *Id.*

¶26.    In answering this question, the supreme court noted the deposition testimony of Batesville's civil engineer that he had advised Batesville as early as 2015 to install the lift station. *Id.* at 485 (¶28). It also noted the affidavit of Williams's expert in which he stated that the measures taken by Batesville prior to installing the lift station "did not work" and were "wrong." *Id.* Observing that Batesville's response was that it had "explored every feasible alternative it could before finally spending the money necessary to install a lift station for one house," *id.* at (¶¶28-29), the supreme court held, "Based on our de novo review of the record, we find that a genuine issue remains as to whether [Batesville] exercised ordinary care in doing so. We reverse and remand for Williams to have the

13

opportunity to present her negligence case against [Batesville] to the trier of fact." *Id.* at (¶30).

¶27. In sum, the supreme court found that Williams could proceed with her negligence claims based upon Batesville's "complete initial failure and subsequent failure[] . . . to properly maintain its sewage lines," *id.* at 483 (¶16), as "Williams may be able to prove a set of facts under the MTCA for actions by the City that are not exempt from immunity[.]" *Id.* at 489 (¶55). Accordingly, the supreme court held "that the circuit court erred by dismissing the claims of basic negligence, and [we] remand the case for further proceedings." *Id.*

¶28. We find that the Hoods' negligent-failure-to-inspect-and-maintain claim against the City is strikingly similar to Williams's claim that the sewage backup in her home happened due to Batesville's failure to properly maintain the sewage system and the way in which it "mishandled" the problem once on notice that her home was being flooded with sewage. *Id.* at 484 (¶23). Like Williams, the Hoods essentially claim that the City failed to exercise ordinary care in maintaining or inspecting the drainage ditch and culvert on Amanda Drive adjacent to their home and mishandled the flooding problems once on notice of the flooding and that it was reoccurring.

¶29. The record reflects that the City had been sued by the prior homeowners for the same flooding problems in 2012, and if this is not sufficient notice, the City was certainly on notice of the flooding issues based upon the Hoods' own reports beginning in 2016. The Hoods' experts found these flooding issues were caused by insufficiencies in the drainage ditch and culvert, yet the City did not fix the problem. The City asserts that it was not required to have

14

a "formal inspection program" and that "it is immune because it complied with its maintenance program." According to the City's public works superintendent engineer from 2012 to 2016, the City's "maintenance plan" was to "clean[] and repair[] culverts within its easements or roadways if it receives notification or becomes aware of an issue." But as in *Williams*, this "stopgap" approach did nothing to alleviate the underlying issues contributing to the flooding. *Cf. id.* at 485 (¶28) (addressing the "ineffective stopgap" measures taken by the city prior to installing the lift-station pump for Williams's home that alleviated the problem). As such, like the supreme court in *Williams*, we find that the Hoods should be allowed to present their "negligence case to the trier of fact." *Id.* at (¶30).

¶30. Similarly, in *Moses*, the supreme court reversed a Mississippi Rule of Civil Procedure 12(b)(6) dismissal in Rankin County's favor based upon discretionary-function immunity where homeowners sued the county for flooding caused by overflow from an adjacent creek. *Moses*, 285 So. 3d at 625-26 (¶¶13-16). The supreme court found that "Rankin County's alleged failure to maintain Mill Creek is a case of simple negligence contemplated in *Wilcher* [*v. Lincoln County Board of Supervisors*, 243 So. 3d 177, 182 (¶12) (Miss. 2018)]. Such maintenance decisions do not involve policy considerations." *Moses*, 285 So. 3d at 625-26 (¶16). Continuing, the supreme court held, "We follow the lead of . . . *Estate of Hudson* [*v. Yazoo City*, 246 So. 3d 872 (Miss. 2018),*] and reverse and remand for further proceedings. The plaintiffs ought to be given the opportunity to fully present their simple negligence claim." *Moses*, 285 So. 3d at 626 (¶16); *see also Est. of Hudson*, 246 So. 3d at 880 (¶¶49-

51);[6] *Bailey*, 282 So. 3d at 678 (¶¶21-23) (After a plaintiff brought a wrongful death action against a city when his wife was severely injured and later died after being struck by an access gate at the city's ballpark, the Court found that the "basic negligence claims" raised by the plaintiff were not protected by discretionary-function immunity and reversed and remanded those claims for further proceedings.). We find no merit in the City's assertions that it is entitled to summary judgment based upon discretionary-function immunity with respect to the Hoods' negligent-failure-to-inspect-and-maintain claim.

¶31. The City also asserts that it is immune from the Hoods' lawsuit "because it arises out of the approval of permits," citing Mississippi Code Annotated section 11-46-9(1)(h).[7] But the crux of the Hoods' negligent-failure-to-inspect-and-maintain claim is not that the City approved upstream developments and permits; rather, the Hoods complain of the flooding that repeatedly occurred on their property due to the way the City mishandled its response to the downstream effect on the drainage system, ditches, and culverts serving the Hoods' neighborhood and property. We find no merit in the City's reliance upon section 11-46-9(1)(h) in asserting it is immune from liability with respect to the Hoods' negligent-

---

[6] *Estate of Hudson* involved a wrongful death lawsuit against Yazoo City for the death of a child who drowned in flash-flood waters that swept through a drainage ditch adjacent to her family residence. *Estate of Hudson*, 246 So. 3d at 873 (¶1). The supreme court recognized that the Estate's claim that the city was liable for its negligent maintenance of the ditch was predicated on "ordinary negligence," *id.* at 880 (¶49), and remanded the case to allow the Estate "the opportunity to fully present its negligence claim," *id.* at (¶51), under the *Wilcher* public-policy function test, which was reinstated while the Estate's case was pending. *Id.*

[7] Section 11-46-9(1)(h) provides that a governmental entity is immune from liability for action "[a]rising out of the issuance . . . of . . . any . . . permit . . . ." Miss. Code Ann. § 11-46-9(1)(h).

failure-to-inspect-and-maintain claim.

¶32.    We find that the circumstances discussed above raise genuine issues of material fact whether the City exercised "ordinary care" in exploring why the flooding was repeatedly occurring on the Hoods' property after heavy rains and how to better address the problem and fix it. *See Williams*, 313 So. 3d at 485 (¶¶28-30). We further find that the City is not entitled to summary judgment based upon immunity under either section 11-46-9(1)(d) or section 11-46-9(1)(h) with respect to this claim. Accordingly, we reverse the trial court's summary judgment in the City's favor and remand this case to allow the Hoods to pursue their negligent-failure-to-inspect-and-maintain claim against the City.[8]

## II.    Application of Mississippi Rule of Civil Procedure 56(f)

¶33.    The Hoods also assert that the trial court erred when it did not grant the Hoods' request pursuant to Mississippi Rule of Civil Procedure 56(f) to require the City to respond to outstanding discovery and to allow additional discovery before ruling on the City's motion for summary judgment. We agree. Upon remand, we find that the City should be required to respond to the discovery the Hoods served upon it in March 2018 and that further discovery should be allowed related to the Hoods' negligent-failure-to-inspect-and-maintain claim.

¶34.    Specifically, the record reflects that in March 2018, the Hoods served discovery on the City, including interrogatories, requests for admissions, and document requests. The City

---

[8] We do not find that the Hoods have asserted a premises liability claim, and thus we need not address the City's argument that it is immune from premises liability claims pursuant to Mississippi Code Annotated section 11-46-9(1)(v).

17

timely answered the requests for admissions and was given an extension until May 2018 to submit its responses to the remaining outstanding discovery. Two good-faith letters were sent in 2018, but the City never responded to the outstanding discovery requests.[9] Instead, it proceeded to file a summary judgment motion.

¶35. The Hoods responded to the City's summary judgment motion and also filed the Rule 56(f) Affidavit in which the Hoods' counsel stated that the Hoods needed the City's responses to their discovery requests "to demonstrate that City of Pearl was negligent in its maintenance of the culvert and the ditches on Amanda Drive." In his affidavit, counsel further stated that depositions needed to be taken, "[s]uch as the deposition of the mayor who said the City was going to do water flow studies and the depositions of employees who allegedly did maintenance work. Plaintiffs do not have access to these individuals and cannot obtain affidavits." After the summary judgment hearing and before the trial court issued its ruling on the City's summary judgment motion, the Hoods also filed a motion to compel the written discovery that the City had ignored.

¶36. Pursuant to Rule 56(f), if "a summary-judgment motion is filed before discovery is complete, the trial court may postpone ruling on the motion to permit depositions to be taken and other discovery to be had." *Roberts v. Boots Smith Oilfield Servs. LLC*, 200 So. 3d 1022, 1026 (¶25) (Miss. 2016) (citing M.R.C.P. 56(f)). This is particularly true "'where the party seeking to invoke the protections of Rule 56(f) claims the necessary information rests within the possession of the party seeking summary judgment.'" *Id.* (quoting *Prescott v. Leaf River*

---

[9] There is no indication in the record that there was a scheduling order in place with respect to discovery deadlines.

18

*Forest Prods. Inc.*, 740 So. 2d 301, 308 (¶13) (Miss.1999)). The denial of Rule 56(f) relief is reviewed for abuse of discretion. *Id.*

¶37. Although we recognize that "Rule 56(f) is not designed to protect the litigants who are lazy or dilatory," *id.* at 1027 (¶27), we do not find that the record in this case supports such a finding given the efforts described above, the Rule 56(f) affidavit filed by the Hoods' counsel, and the further explanation regarding the need for additional discovery that counsel provided at the summary judgment hearing. In addition to setting forth the discovery needed and the reason for it in his Rule 56(f) affidavit, the Hoods' counsel also explained to the trial court at the summary judgment hearing why the written discovery and additional depositions were necessary with respect to the Hoods' negligence claims.

¶38. Regarding the written discovery, we recognize that there was not a pending motion to compel at the time of the summary judgment hearing. Nevertheless, the record reflects that the Hoods had given the City an extension to file its discovery responses, and when it still failed to respond, the Hoods sent two good-faith letters to the City explicitly requesting the discovery. Yet the City ignored these efforts and proceeded to file its summary judgment motion.

¶39. Further, separate from any written discovery, the Hoods' counsel also specifically demonstrated in his Rule 56(f) affidavit and at the summary judgment hearing the need for depositions of persons outside the Hoods' control. *See id.* at 1026 (¶25) (recognizing that postponing a summary judgment hearing is particularly important where "necessary information rests within the possession of the party seeking summary judgment"). For

19

example, Mr. Hood's deposition testimony reflects that when he asked the mayor what other things could be done (besides replacing a broken part of a culvert) to prevent the flooding, the mayor told him that the City would need to do some water flow studies. For this reason, the Hoods' counsel explained, the mayor's deposition was necessary to explore this issue further. Counsel also explained that although he had testimony from his own expert regarding the cause of the problems, he would need to depose the city engineer, as well as the "head of the maintenance department or maintenance crews, to find out . . . what, if anything, [the City] did[,] particularly after the first two floods as far as inspecting the flow of water, particularly when the new subdivision . . . was approved by the city." Such proposed evidence could potentially further show how the City allegedly mishandled the Hoods' flooding complaints.

¶40.    As the supreme court has recognized, "[j]ustice is served when a fair opportunity to oppose a motion is provided—because consideration of a motion for summary judgment requires a careful review by the trial court of all pertinent evidence in a light most favorable to the nonmovant." *Id.* at 1028 (¶34) (emphasis omitted) (quoting *Cunningham v. Lanier*, 555 So. 2d 685, 686 (Miss. 1989)). We find that the above-described discovery would have assisted the Hoods in further developing and articulating their negligence claim, and, therefore, we find that under these particular circumstances it was an abuse of discretion for the trial court to rule on the City's summary judgment motion before discovery was completed. On remand, the City should be required to serve its responses to the outstanding discovery, and further discovery should be allowed with respect to the Hoods' negligent-

failure-to-inspect-and-maintain claim.

¶41. Because the Hoods may be able to prove a set of facts under the MTCA for actions by the City that are not exempt from immunity, we hold that the trial court erred in granting summary judgment in the City's favor with respect to the Hoods' negligent-failure-to-inspect-and-maintain claim, and we remand the case for further proceedings with respect to their negligence claim as detailed above.

¶42. **REVERSED AND REMANDED.**

**WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., WILSON, P.J., AND SMITH, J. EMFINGER, J., NOT PARTICIPATING.**

**GREENLEE, J., DISSENTING:**

¶43. In deciding whether the City was protected by discretionary-function immunity, the circuit court had to distinguish between real policy decisions implicating governmental functions and simple acts of negligence. In doing so, the court relied on the representations of counsel at the summary judgment hearing. Having done so, the court determined that any negligence claim as to the maintenance of the culverts and drainage system was no longer at issue. The court further determined that the remaining negligence claims were based upon policy decisions implicating governmental functions. Because I would affirm the judgment of the circuit court, I must dissent.

I.    **Summary Judgment**

¶44. The majority finds that the circuit court mischaracterized the Hoods' negligence claim and erred by granting summary judgment in favor of the City. Specifically, the majority finds

21

that the Hoods raised a basic, or simple, negligence claim based upon the City's alleged negligent failure in inspecting and maintaining the culverts and drainage system serving their property and that the City was not protected by discretionary-function immunity. I disagree.

¶45. The grant of summary judgment is reviewed de novo. *Wright v. R.M. Smith Invs. L.P.*, 210 So. 3d 555, 557 (¶6) (Miss. Ct. App. 2016). "Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id*. (quoting *Thrash v. Deutsch, Kerrigan & Stiles LLP*, 183 So. 3d 838, 841 (¶10) (Miss. 2016)). However, "the evidence must be viewed in the light most favorable to the nonmovant." *Id*.

¶46. The Mississippi Tort Claims Act (MTCA), Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2019), "waives sovereign immunity and allows public entities to be sued for certain torts of governmental entities and their employees after receipt of proper notice." *Bailey v. City of Pearl*, 282 So. 3d 669, 672 (¶8) (Miss. Ct. App. 2019). "But Mississippi Code Annotated section 11-46-9(1) identifies twenty-five types of claims for which a public entity shall not be liable (i.e., for which it remains immune from suit), including claims:

> (d) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused . . . .

*Bailey*, 282 So. 3d at 672 (¶8) (quoting Miss. Code Ann. § 11-46-9(1)(d)). The supreme court and this Court "consider MTCA immunity as an affirmative defense," and "a defendant's failure to timely and reasonably raise and pursue the enforcement of any affirmative defense or other affirmative matter or right which would serve to terminate or

22

stay the litigation, coupled with active participation in the litigation process, will ordinarily serve as a waiver." *Cook v. Taylor*, 324 So. 3d 333, 337-38 (¶¶21-22) (Miss. Ct. App. 2021); *see also Grimes ex rel. Estate of Grimes v. Warrington*, 982 So. 2d 365, 370 (¶24) (Miss. 2008); *MS Credit Ctr. Inc. v. Horton*, 926 So. 2d 167, 180 (¶44) (Miss. 2006).

¶47.    "[T]he purpose of discretionary-function immunity is not to protect *all* decisions by governmental employees involving some level of discretion but instead only those functions that by their nature are policy decisions." *Moses v. Rankin County*, 285 So. 3d 620, 623 (¶10) (Miss. 2019) (quoting *Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177, 182 (¶12) (Miss. 2018)).   Recently, our supreme court "returned to its traditional, two-part, public-policy function test to determine when [s]ection 11-46-9(1)(d) applies." *Id*. (quoting *City of Clinton v. Tornes*, 252 So. 3d 34, 39 (¶20) (Miss. 2018)).   However, "[b]efore employing the test, the Court must correctly identify the activity in question—the allegedly tortious act giving rise to the claim." *Id*. (internal quotation marks omitted) (quoting *Wilcher*, 243 So. 3d at 187 (¶30)).

¶48.    On appeal, the Hoods acknowledge that their complaint raised several theories of negligence, but they assert that their "main claim" was that the City was negligent in properly maintaining the nearby culvert.   At the hearing on the City's motion for summary judgment, the court attempted to clarify the Hoods' negligence claim several times.

> COURT:    Now my memory of this case is that there's not really allegations here that the [C]ity failed to clean out debris from a drainage easement. . . . [T]he allegations I believe that I recall, are that a particular culvert had been installed as the wrong size and that . . . it was installed prior to the [C]ity taking in the roadway or the area and had been installed actually by

somebody else; but, you know, the argument is that the culvert there was too small to handle the drainage;

And other allegations by the [Hoods] were that because of other construction in the area . . . and permits that had been approved by the [C]ity that retention ponds were not sufficient and that the permits for construction failed to adequately take into consideration drainage.

And so [counsel], you correct me if I'm wrong, I don't think it's a situation here, "Hey, we told you that . . . the easement was clogged up and y'all failed to come over there and unclog it, take the trash or stumps or limbs or whatever out." It's more of "The drainage is inadequate because of the size of the pipe and because you've made these other approvals you failed to adequately account for drainage in this area."

COUNSEL: Yes, sir, that's the sum and substance [of] what caused the flooding according to my hydraulics engineer.

. . . .

COURT: And so it's not a case where, although there's been some arguments about simple negligence, Justice Waller's dissent there was talking about simple negligence in . . . failing to unclog a drainage easement.

We're here talking about other acts, and . . . it is the [City's] argument that the allegations of these complaints invoke public policy decisions on the approval of drainage easements, what size culverts to put in areas, whether to replace culverts, whether to approve sizes, retention ponds, whether or not proper and approval of plans for constructions of houses or subdivisions, whether or not proper allowance is made for drainage. It is, I take it, the [City's] position that all those implicate policy decisions and, therefore, you're entitled to discretionary function immunity.

¶49. Then the court attempted to clarify the Hoods' negligence claim again:

COURT: [Counsel], do you agree that . . . we're not talking about a simple act of negligence in failing to unclog a drainage

24

> easement, that we're talking about the wrong size culvert, the failure to replace a culvert, the approval of construction plans and retention ponds without taking into account the effect that it has on your [clients' property].
>
> COUNSEL: Well, also the fact they failed to inspect and maintain the drainage ditch . . . .
>
> . . . .
>
> COURT: I thought you agreed with me a while ago that it's not a situation where there's allegations that the drainage easements were clogged . . . .

¶50. The majority submits that counsel clarified that the Hoods claimed they were damaged because the City failed to maintain and inspect the ditch:

> COUNSEL: No, sir. It was just not inspected. And if it was inspected, they would have found out the drainage was coming from these subdivisions and the gravel pit up the road and then they wouldn't have had the tremendous amount of water they have.

¶51. However, the court continued to question counsel in an attempt to clarify the Hoods' claim:

> COURT: Well, that's my point. That's what I want to boil it down to . . . [I]t's not a situation of "Y'all come out there and pick up these stumps." It's a situation of "Y'all are not paying attention to the drainage in this area and you should have been aware of this and made other provisions for drainage."
>
> COUNSEL: Yes, sir. Because it created a dangerous condition, which the house flooded four times.
>
> . . . .
>
> COURT: I'm trying to make sure that I have a clear line of argument here.
>
> [Counsel], I don't believe there's any summary judgment proof that the drainage easements were clogged with debris or stumps

25

> or anything of that nature that caused damages to your folks. Do you agree with that or not?
>
> COUNSEL: Yes, sir, I agree with that . . . .
>
> COURT: . . . I just want to make sure that we're all clear. There's no summary judgment proof on the [Hoods'] part to show that any of the damages here were occasioned by the failure of the [C]ity to remove debris or obstructions in drainage easements.
>
> COUNSEL: Judge, there is in the fact that we only have one incident in the four floods where they came out and removed debris and that was when our client called. There's no maintenance records or nothing in the record they presented that there was anything but one incident when they came out.
>
> COURT: But my question was, do you have any summary judgment proof here that the flooding and damage to your clients were caused by obstructions in the drainage easements?

Ultimately, counsel stated that there was not any summary judgment proof.

¶52. Later, the court attempted to clarify the Hoods' negligence claim yet again:

> COURT: All right. [Counsel], I want to come back to you one - -
>
> COUNSEL: Yes, sir.
>
> COURT: - - last time here. It seems to me that your argument is that . . . the real problem here is the fact that the [C]ity failed to inspect and maintain based upon their approvals of the upstream developments - -
>
> COUNSEL: Yes, sir.
>
> COURT: - - which increased the flow.
>
> COUNSEL: And their knowledge of that, plus they've been sued in 2012 over the same issue, that same house.
>
> . . . .

COURT: So the question, though, becomes whether or not the [C]ity had a responsibility to inspect and whether or not, as it relates to those approved permits - -

. . . .

COURT: - - whether or not they've got discretionary function and immunity?

¶53. In the order granting summary judgment, the court found that "the [Hoods'] claim [was] not based upon simple negligence by the City of Pearl in failing to keep drainage easements free of debris." Rather, the court found that "the basis of [the Hoods'] claim [was] that the City was negligent in its approval of other development plans "up stream," its failure to monitor how those approved development plans impacted the flow of water "downstream," and its failure to detect and/or correct any problems caused by any increased water flow as a result of the approved new developments." After reviewing the record, I cannot find as the majority does that the court "overlooked the [Hoods' simple] negligence claim." Rather, in characterizing the Hoods' claim, the court thoroughly questioned the Hoods' counsel about the claim and relied on counsel's representations to the court.

¶54. I also disagree with the majority's conclusion that the court erred by finding that the City was protected by discretionary-function immunity. "The public-policy function test has two parts." *Moses*, 285 So. 3d at 624 (¶10) (quoting *Wilcher*, 243 So. 3d at 182 (¶12)). First, "[t]his Court first must ascertain whether the activity in question involved an element of choice or judgment." *Id*. "If so, this Court also must decide whether that choice or judgment involved social, economic, or political-policy considerations." *Id*. "Only when both parts of the test were met did a government defendant enjoy discretionary-function immunity."

27

*Id.*

> Because discretionary-function immunity protects only governmental actions and decisions based on considerations of public policy, when applying the discretionary-function exception, this Court must distinguish between *real policy decisions* implicating governmental functions and *simple acts of negligence* which injure innocent citizens. Thus when reviewing whether a challenged action is afforded immunity, a court's focus is on the nature of the actions taken and whether they are susceptible to policy analysis.

*Id.* (internal quotation mark omitted) (quoting *Wilcher*, 243 So. 3d at 188 (¶34)).

¶55. In this case, the Hoods asserted that the culvert was improperly designed. The City presented evidence that the culvert was not within the city limits when it was designed but was annexed after its installation. Nevertheless, any decisions made related to the design and construction of the culvert would involve policy considerations. Additionally, I agree with the circuit court that the subsequent decisions to approve upstream developments involved social, economic, and/or political policy considerations.

¶56. The Hoods further asserted that if the City would have inspected the culvert, it would have known that a larger culvert was needed to handle the water flow, especially in light of developments upstream. But again, the decision to approve developments upstream involved policy considerations, and I agree with the circuit court that "responding to any issues [related to change in water flow] that may arise as a result of new development" involved policy considerations."[10] For these reasons, I would affirm the circuit court's grant of

[10] In *Fisher*, the appellant argued that the installation and size of culverts were not discretionary and therefore not immune as discretionary functions. *Fisher v. Lauderdale Cnty. Bd. of Supervisors*, 7 So. 3d 968, 970 (¶10) (Miss. Ct. App. 2009) *overruled on other grounds by Bailey v. City of Pearl*, 282 So. 3d 669 (Miss. Ct. App. 2019). However, this Court held that Mississippi Code Annotated section 65-21-1 (Rev. 2005) "does not impose any obligation on the Board of Supervisors to install culverts. It merely sets the minimum

summary judgment.[11]

## II. Discovery

¶57. The majority also finds that the court should have compelled the City to answer discovery before it considered the City's motion for summary judgment. Again, I disagree.

¶58. "[T]he [circuit] court's grant or denial of a motion to compel is subject to an abuse of discretion standard of review on appeal." *Strickland v. Estate of Broome*, 179 So. 3d 1088, 1094 (¶19) (Miss. 2015) (quoting *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1209 (¶57) (Miss. 2003)). "The [circuit] court has considerable discretion in matters relating to discovery and its order will not be disturbed unless there has been an abuse of that discretion." *Id*. (quoting *French v. Druetta*, 399 So. 2d 1327, 1329 (Miss. 1981)).

¶59. In February 2018, the Hoods filed a notice of service of request for admissions,

---

length for a culvert . . . if the Board of Supervisors should decide to install a culvert." *Id*. at 970-71 (¶11). Importantly, this Court held "any decisions made outside of those minimum requirements are discretionary functions of government." *Id*. at 971 (¶11). The Hoods have not alleged that the culvert does not comply with the statutory size requirements.

[11] The Hoods also assert on appeal that the court erred by denying their motion for reconsideration in light of the supreme court's recent decision in *Moses*. The majority combines this issue with the summary judgment issue. I would simply note that in *Moses*, the plaintiffs alleged that because Rankin County had failed to maintain Mill Creek, "shrubs, vegetation and trees were allowed to grow to the point where a barrier was created which significantly obstructed the flow of storm water" and caused flooding. *Moses*, 285 So. 3d at 621-22 (¶2). However, in this case, the Hoods' attorney indicated that their negligence claim was not based on any failure of the City to maintain by not removing debris. Furthermore, in *Moses*, the county undertook routine maintenance on Mill Creek and then stopped the maintenance, which the plaintiffs claimed led to their damages. *Id*. Therefore, I do not believe that the court abused its discretion by denying the Hoods' motion for reconsideration.

interrogatories, and production of documents. However, in March 2019, the City filed a motion for summary judgment without responding to the Hoods' request for discovery. At some point, the City responded to the request for admissions but not the request for interrogatories or production of documents. The Hoods sent a letter to the City's attorney dated August 28, 2018, in which the Hoods' counsel requested a response to the interrogatories. Then in a letter dated September 18, 2018, counsel requested a response to the interrogatories and request for production of documents. In May 2019, the Hoods' attorney filed a "Rule 56(f) Affidavit."[12] In the affidavit, the Hoods' attorney stated that the City had not responded to discovery and asked the court to require the City to respond, continue the matter, and allow depositions to be taken.

¶60. At the hearing on the motion for summary judgment in September 2019, the Hoods asserted that the City still had not answered discovery. The court asked if a motion to compel discovery had been filed, and counsel responded, "I sent a letter to file a motion to compel. Then there was a question of whether they got them or not. And to be honest, judge, I got busy and didn't follow up on." After the hearing, the Hoods filed a motion to compel discovery; however, the court ultimately granted summary judgment in favor of the City.

¶61. At the hearing on the Hoods' motion for reconsideration, the Hoods argued that the

---

[12] Mississippi Rule of Civil Procedure 56(f) provides:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

court should have compelled the City to answer discovery before it considered the City's motion for summary judgment. The court asked counsel why a motion to compel had not been filed, and the court also noted that counsel did not seek a continuance at the hearing on the motion for summary judgment. The Hoods' attorney admitted that a motion to compel discovery had not been filed until after the hearing on the motion for summary judgment and indicated that it was an "error on [their] part."

¶62. Our supreme court has held that "[w]here one party alleges another party failed to fully respond to discovery, the proper procedure is for the aggrieved party to seek a remedy from the trial court by filing a motion to compel." *Boyd ex rel. Mastin v. Nunez*, 135 So. 3d 114, 116 (¶13) (Miss. 2014) (citing *Ford Motor Co. v. Tennin*, 960 So. 2d 379, 393 (Miss. 2007)). Furthermore, under Mississippi Rule of Civil Procedure 37(a) "[a] party, *upon reasonable notice* to other parties and all persons affected thereby, may apply for an order compelling discovery . . . ." (Emphasis added). The Hoods waited more than two years after filing their complaint and until after the summary judgment hearing to file a motion to compel discovery, and their attorney indicated that this was an "error on [their] part." Unlike the majority, I believe that the Hoods were not diligent in pursuing discovery.

¶63. Furthermore, the Hoods did not provide a compelling reason as to why additional discovery was necessary prior to the court's ruling on the motion for summary judgment. At the summary judgment hearing, the judge asked what additional discovery the Hoods needed.

> COUNSEL: The additional discovery I'm going to need is like their engineer, the city engineer that approved the engineering on that particular job . . . .

COURT:      Well, your [expert has] already said they messed up.

COUNSEL:  Yes, sir.

COURT:      I mean . . . if that's the issue, then you've created a genuine issue of material fact by your expert's - -

. . . .

COURT:      - - testimony.

COUNSEL:  Yes, sir.

COURT:      So the question, though, becomes whether or not the [C]ity had a responsibility to inspect and whether or not, as it relates to those approved permits - -

. . . .

COURT:       - - whether or not they've got discretionary function and immunity?

            The question I'm really focusing on right now is, what additional discovery do you need to address that point?

COUNSEL:  I would probably need to, whoever was the head of the maintenance department or maintenance crews, to find out what, if any - - what, if anything, they did particularly after the first two floods; as far as inspecting the flow of water, particularly when the new subdivision that come in, it was approved by the [C]ity. So if they were aware, the [C]ity - - if the [C]ity was aware the water flow had increased substantially, the maintenance people . . . . And so the issue is, did they have a duty - - should they have used due care to inspect the water flow to see whether there was more or not and if it was creating a problem that the - - at that point was the culvert inadequate to - -

COURT:      Well, how - -

COUNSEL:   - - carry the water out.

COURT:       - - are you going through discovery decide whether or not they

had a duty to inspect?

COUNSEL: Well - -

COURT: It looks like you'd be able to point to some statutory duty if one exists.

COUNSEL: I think after the subdivision went into business that they had a duty at that point to go down and see what effect, if any, it had on the water flow . . . .

COURT: Anything further?

COUNSEL: No, sir.

¶64. Because I believe that the court's grant of summary judgment was proper and that the Hoods were not diligent in pursuing discovery, I would affirm the circuit court's judgment. Therefore, I dissent.

**BARNES, C.J., WILSON, P.J., AND SMITH, J., JOIN THIS OPINION.**